# EXHIBIT A

1

1    RENEE BLACKWELL

2    IN THE UNITED STATES DISTRICT COURT

3    DISTRICT OF NEW JERSEY

4    (Camden Vicinage)

5    RENEE BLACKWELL,            : CIVIL ACTION
                   Plaintiff    :
6        vs                     :
     STATE OF NEW JERSEY        :
7        and                    :
     NEW JERSEY DEPARTMENT OF   :
8    CHILDREN AND FAMILIES,     :
     DIVISION OF YOUTH AND      :
9    FAMILY SERVICES            :
         and                    :
10   CHRISTINE MOZES,           :
     INDIVIDUALLY AND IN HER    :
11   OFFICIAL CAPACITY AS       :
     DIRECTOR OF DIVISION OF    :
12   YOUTH AND FAMILY SERVICES  :
         and                    :
13   KIMBERLY RICKETT [sic],    :
     INDIVIDUALLY AND IN HER    :
14   OFFICIAL CAPACITY AS       :
     COMMISSIONER OF NEW JERSEY :
15   DEPARTMENT OF CHILDREN AND :
     FAMILIES                   :
16       and                    :
     DOLORES HELB, INDIVIDUALLY :
17   AND IN HER OFFICIAL        :
     CAPACITY AS AN EMPLOYEE OF :
18   NEW JERSEY DEPARTMENT OF   :
     CHILDREN AND FA MILES      :
19       and                    :
     DEBRA BOEHME, INDIVIDUALLY :
20   AND IN HER OFFICIAL        :
     CAPACITY AS AN EMPLOYEE OF :
21   NEW JERSEY DEPARTMENT OF   :
     CHILDREN AND FAMILIES      :
22       and                    :

23

24

25



**Page 6**

RENEE BLACKWELL

1  RENEE BLACKWELL
2  (It is hereby stipulated and
3  agreed by and among counsel for the
4  respective parties that sealing,
5  certification, and filing are waived
6  and that all objections, except as to
7  the form of the question, be reserved
8  until the time of trial.)
9  RENEE BLACKWELL, after having
10 been first duly sworn, was examined and
11 testified as follows:
12 * * *
13 EXAMINATION
14 * * *
15 BY MS. JORDAN:
16 Q.   Good morning, Ms. Blackwell. My
17 name is Karen Jordan. I'm an attorney for the
18 State defendants in this case, who include the
19 State of New Jersey, the Department of Children
20 and Families, Division of Youth and Family
21 Services, Kimberly Ricketts, Christine Mozes,
22 Barbara Parnes, and Debra Boehme.
23 I'm going to start with some
24 instructions on the nature of this proceeding
25 and -- just some instructions on how -- how we

**Page 7**

RENEE BLACKWELL

1  RENEE BLACKWELL
2  should go forward.
3  A.   Can you speak up just a little
4  bit?
5  Q.   Sure.
6  This is a deposition for me and
7  the other parties to find out the facts of the
8  case.
9  A.   Um-hmm.
10 Q.   It's a discovery deposition.
11 You are sworn, and it has the same effect as if
12 you were testifying in court. So you're under
13 oath.
14 All your answers have to be
15 audible -- that means they have to be out
16 loud -- because the court reporter is taking
17 them down --
18 A.   Okay.
19 Q.   -- and she can't take down if
20 you shake your head or something like that.
21 A.   Okay.
22 Q.   If I ask you a question and you
23 don't understand the question or don't hear it
24 because I am soft spoken, please tell me that.
25 If you go ahead and answer it, it will be

**Page 8**

RENEE BLACKWELL

1  RENEE BLACKWELL
2  assumed that you understood it and heard it.
3  A.   Okay.
4  Q.   I don't want you to speculate or
5  guess on answers, but if you can make an
6  estimate, I would like you to try to do that,
7  if you don't know the specific answer.
8  A.   Okay.
9  Q.   Is there anything -- any others?
10 I guess that's pretty much it.
11 If I think of any more, I'll -- I'll -- I'll
12 tell you what the other instructions are.
13 A.   Okay.
14 Q.   Did you talk with your attorney
15 before this deposition? This is a yes-or-no
16 answer.
17 A.   Yes.
18 Q.   Okay. Did you look at any
19 documents to prepare for the deposition?
20 A.   No.
21 Q.   Okay. Did you bring any
22 documents with you today?
23 A.   I brought the original letter
24 that I sent to Mr. Friedman.
25 Q.   Who is Mr. Friedman?

**Page 9**

RENEE BLACKWELL

1  RENEE BLACKWELL
2  A.   He was the original attorney
3  before my referral.
4  Q.   Okay. That's confidential, so I
5  wouldn't want to see that.
6  A.   Okay.
7  Q.   This lawsuit is about your claim
8  that the Division gave out information that was
9  confidential. When was your first contact
10 about that information with the Division of
11 Youth and Family Services or the State?
12 A.   The Tuesday -- the Tuesday after
13 the 13th.
14 Q.   13th of what month and what
15 year?
16 A.   December of '08.
17 Q.   ~~Did you receive it long before~~
18 ~~that~~
19 A.   ~~Around the 2000 or~~
20 Q.   ~~~~
21 A.   ~~Yes~~
22 Q.   ~~When was that letter?~~
23 A.   ~~Around August of '08.~~
24 Q.   Okay. And what -- what did that
25 ~~letter say?~~

3 (Pages 6 to 9)

14

```
                 RENEE BLACKWELL
1
2      Q.    Yes.
3      A.    I would assume -- they both left
4  the porch and got back in the -- I think it was
5  a black SUV.
6      Q.    Okay.  Did Denine ever contact
7  you again?
8      A.    I've never heard from her since
9  then.
10     Q.    Okay.  When did you next talk to
11 anybody about Denine's search for her
12 biological mother?
13     A.    The following Tuesday.  Okay?
14 Monday, I tried all day to get in touch with
15 Ms. Helb.  I was unable to get in touch with
16 Ms. Helb.  I did not leave a message.  I wanted
17 to speak to someone.
18          On Tuesday, I left a message and
19 got a return phone call from Barbara Parnes on
20 my cell phone.
21     Q.    And what was that conversation?
22     A.    I explained what happened on
23 Saturday, and Ms. Parnes explained to me that,
24 because we did not hear from you, we
25 essentially went on and did what we had to do.
```

15

```
                 RENEE BLACKWELL
1
2           At that same conversation, I --
3  I asked her -- I said, you didn't have any type
4  of authorization from me, no permission
5  whatsoever.  She said, no, we just went on and
6  did what we had to do.
7           She further stated that, as a
8  matter of fact, you biological daughter,
9  Jenine, is speaking with Denine right now.
10 That was a Tuesday.
11          I asked, what number -- what
12 number did you give my daughter; what number
13 are you using?  She gave me a number.  I
14 believe it began with a nine.  It was not a
15 familiar number.  And I became very upset.
16     Q.    This was Jenine's number
17 starting with a nine?
18     A.    She said that it was Jenine's
19 number.  Ms. Parnes said it was Jenine's
20 number.  Jenine is my daughter biological.
21 It's J-e-n-i-n-e.  And, ironically, the adopted
22 daughter is Denine.
23     Q.    So, when Ms. Parnes or Parnes
24 said to you, we did what we had to do, what did
25 that mean to you?
```

16

```
                 RENEE BLACKWELL
1
2      A.    It meant that regardless of
3  whether or not I reunited them or not, the State
4  went on and disclosed my information anyhow.
5      Q.    Does she say that as you--
6      A.    Yes, she did say--
7      Q.    Had you talked to Jenine about
8  this before -- before -- well, let's start
9  with, before the day that Denine came to your
10 door --
11     A.    No.
12     Q.    -- had you talked to Jenine?
13     A.    No.
14     Q.    How about before you spoke to
15 Ms. Parnes?
16     A.    Did I speak to
17 Ms. Parnes about --
18     Q.    Did you speak to Denine before
19 you spoke to Ms. Parnes --
20     A.    No.
21     Q.    -- before this conversation you
22 just discussed?
23     A.    No.
24     Q.    Did you speak to Jenine after
25 that?
```

17

```
                 RENEE BLACKWELL
1
2      A.    No.
3      Q.    Did you speak to Jenine any
4  time about your biological daughter you gave up
5  for adoption?
6      A.    Later on.  Much more later on.
7  I was not aware that she had spoken to Denine.
8  She never disclosed it to me.
9      Q.    When you say, "later on," when
10 did you first discuss this issue with your
11 daughter Jenine?
12     A.    Months later at that point in time.
13     Q.    Okay.  And when was that, if you
14 can give me a month?
15     A.    It's going to be very difficult.
16 It's going to be very difficult.
17     Q.    And what was that conversation
18 when you had that first conversation with
19 Jenine?
20     A.    It was through an email that my
21 daughter sent to me, that she had spoken with
22 Denine and she felt that -- I printed the email
23 out; I don't know what it was -- she felt
24 that -- she just wants to know you; perhaps --
25          I'm not too sure about the
```

5 (Pages 14 to 17)

```
                                          22
 1            RENEE BLACKWELL
 2     old were you?
 3         A.    You would have to subtract her
 4     present age from 64, and that's the way you'd
 5     have to come up with it.
 6         Q.    Okay.  ~~Did you have any other~~
 7     ~~children at the time?~~
 8         A.    ~~I had two.~~
 9         Q.    And what were their ages?
10         A.    They were toddlers, maybe 4 or 5
11     years old.  They were toddlers.
12         Q.    Was one of those children
13     Jenine?
14         A.    ~~Jenine was one.~~
15         Q.    And what was the name of the
16     other children?
17         A.    ~~Sonny Sneezer.~~
18         Q.    Were you married at the time?
19         A.    No, I've never been married.
20         Q.    Were you working at the time?
21         A.    No, I don't think so.
22         Q.    Did you have any kind of income
23     at that time?
24         A.    Medicaid, probably, for a year.
25         Q.    Were you on welfare at that
```

```
                                          23
 1            RENEE BLACKWELL
 2     time?
 3         A.    Yes.
 4         Q.    Were you living with your aunt
 5     at that time, when Denine was born?
 6         A.    No.  I had moved out and gotten
 7     my own place.
 8         Q.    Who lived in that home?
 9         A.    Who lived in that home?
10         Q.    Who lived there, yes.
11         A.    My two children and myself, the
12     apartment.
13         Q.    Did you know Denine's father
14     before -- you allege that he raped you.  Did
15     you know him before that?
16         A.    Yes.
17         Q.    How did you know him?
18         A.    I met him in the street, at a
19     bar, probably.  Yes.
20         Q.    How long did you know him?
21         A.    Off and on, for maybe a year.
22         Q.    And did you continue to have a
23     relationship with him after --
24         A.    No.
25         Q.    -- the rape?
```

```
                                          24
 1            RENEE BLACKWELL
 2         Did you report the rape to
 3     anybody?
 4         A.    No.
 5         Q.    Did you talk to anyone in your
 6     family about it?
 7         A.    When I became pregnant, yes.
 8         Q.    Who did you talk to about it?
 9         A.    Josie and my mother.
10         Q.    Who is Josie?
11         A.    Josie Hollingsworth is my aunt
12     by marriage, and she works for the
13     children of -- at that time, she worked for the
14     State.  She worked DYFS.
15         Q.    Where does she live right now?
16         A.    Mays Landing.
17         Q.    Do you have her address?
18         A.    At home.
19         Q.    Could you provide it to your
20     attorney?
21         MS. JORDAN:  And I'll ask that
22         you provide that address.
23         MR. BAIRD:  We will do that.
24     BY MS. JORDAN:
25         Q.    And did you say your mother
```

```
                                          25
 1            RENEE BLACKWELL
 2     also?
 3         A.    Yes.
 4         Q.    Where is she living now?
 5         A.    Jeffries Towers in Atlantic
 6     City.
 7         Q.    Okay.  I'm also going to make
 8     the same request for her address, unless you
 9     know it.
10         A.    227 Vermont Avenue, Apartment
11     907, Atlantic City, New Jersey.
12         Q.    Okay.  How did -- ~~how did it~~
13     ~~come about that you gave up Denine for~~
14     ~~adoption?  How did it happen?~~
15         A.    It came about because I could
16     not afford to care for her.  With two toddlers,
17     a single parent by choice, nine months to think
18     about it -- ~~I could not afford to care for~~
19     ~~her --~~
20         Q.    Okay.
21         A.    -- ~~which she~~
22     ~~should have known from --~~
23         Q.    And what steps did you take so
24     that she would be adopted?
25         A.    Spoke to my Aunt Josie.
```

---

**30**

```
RENEE BLACKWELL
1
2        Q.      Have you had any treatment for
3    those injuries?
4        A.      No.
5        Q.      Are you claiming --
6        A.      I have congestive heart failure.
7    I have medication.  I've been advised to have a
8    pacemaker, which I refuse to have.  But beat
9    up, that type of thing, no, but she has, even
10   now, completely infiltrated my life, even now,
11   and I really do resent that.
12       Q.      Do you claim any physical injury
13   as a result of this incident?
14       A.      Of this incident?
15       Q.      Um-hmm.
16       A.      No, I can't say that, not in
17   truthful -- no.
18       Q.      Are you working now?
19       A.      Working?
20       Q.      Are you working?
21       A.      Every day.
22       Q.      Have you lost any work because
23   of this incident?
24       A.      No, just times coming for
25   attorney -- no.
```

**31**

```
RENEE BLACKWELL
1
2        Q.      Okay.  I'm just going to take a
3    minute.  I actually might be finished.
4        A.      Okay.
5        Q.      And then Mr. Mikulski will have
6    the opportunity to question you.
7        A.      Okay.
8                   * * *
9                  (Pause)
10                  * * *
11   BY MS. JORDAN:
12       Q.      Ms. Blackwell, in discovery, we
13   provided a statement by Denine Harvey [sic] to
14   your attorney.  Have you seen that statement?
15       A.      No.
16           MS. JORDAN:  Okay.  I think I'm
17   finished.
18                  * * *
19             EXAMINATION
20                  * * *
21   BY MR. MIKULSKI:
22       Q.      Ms. Blackwell, good morning.
23       A.      Good morning.
24       Q.      My name is Mike Mikulski, and I
25   represent Dolores Helb.
```

**32**

```
RENEE BLACKWELL
1
2        A.      Okay.
3        Q.      Have you ever spoken to
4    Ms. Helb?
5        A.      No.
6        Q.      You spoke earlier about a letter
7    that you received that she had written; is that
8    right?
9        A.      Okay.
10       Q.      Do you remember that?
11       A.      Yes.
12       Q.      And you said you made attempts
13   to call her on a Monday.
14       A.      Yes.
15       Q.      You never successfully reached
16   her?
17       A.      Never.
18       Q.      Not just that Monday, but any
19   time?
20       A.      Never.
21       Q.      Did you receive any other
22   letters from her other than that one letter?
23       A.      No.
24       Q.      And was that letter on State of
25   New Jersey letterhead?
```

**33**

```
RENEE BLACKWELL
1
2        A.      Yes.
3        Q.      From the Division of Youth and
4    Family Services?
5        A.      Yes.
6        Q.      Have you ever received any other
7    letters from Ms. Helb other than something on
8    New Jersey letterhead?
9        A.      No.
10       Q.      ████████████████████ Denine
11   ████████████████████████████████████
12       A.      ████████████████ what I have just
13   ████████████████
14       Q.      Okay.  I don't want you to tell
15   me what your attorneys have told you.
16       A.      No.
17       Q.      Okay.  Tell me what you know,
18   then.
19       A.      No, not from attorneys.
20       Q.      Okay.
21       A.      From my grandson.
22       Q.      Okay.
23       A.      ██████████████ is 18 years old, and
24   he said ████████████████████████████ my
25   ████████████████████████████████ State
```

9 (Pages 30 to 33)



**38**

RENEE BLACKWELL

1
2    Q.    ~~Okay. And did it come up with~~
3 ~~your address?~~
4    A.    ~~Yes, it did -- Atlantic City~~
5 ~~Public Library.~~
6    Q.    Okay.  You said a few minutes
7 ago that even today, Denine has -- and I think
8 I wrote it down -- infiltrated your life.
9 Could you tell me about that, what you mean by
10 that?
11    A.    The way that -- if I were in her
12 position, the way that I would have handled
13 this would probably have been in a letter
14 format.
15          When I spoke to the first
16 attorney, Mr. Friedman, his advice was to --
17    Q.    I can't -- I don't -- you can
18 voluntarily tell me that, but I'm not allowed
19 to ask you about advice that your lawyer has
20 given you.
21    A.    Oh, okay.
22          She's essentially gone on and
23 contacted all members of my family -- I'll put
24 it to you like that --
25    Q.    Okay.

**39**

RENEE BLACKWELL

1
2    A.    -- knowing what -- how I feel
3 about it.  Stamps are, like, 44 cents.
4          She has essentially, even this
5 past Saturday -- I found out that she was at my
6 mother's house this past Saturday with her
7 boyfriend.
8          I lost my son January 27th --
9    Q.    I'm sorry to hear that.
10    A.    -- and she went to the hospital
11 to see him.
12          She was across the street at my
13 house two Thursdays ago.  They had a
14 candlelight vigil for my son.  And way that I
15 knew that she was there was because the next
16 day my grandson called me, and he said that,
17 Denine said you acknowledged her last night.
18          Acknowledged her where?  She was
19 at the vigil last night, Grandmom, and she said
20 you acknowledged her.
21          And I went on to explain to him
22 that it was cold outside.  Everybody had on
23 hoods and everything, about 50 people out there
24 that were there for my son.  So I pretty much
25 acknowledged everyone there.  And I say that to

**40**

RENEE BLACKWELL

1
2 say that I didn't even recognize her.
3    Q.    Okay.
4    A.    So she's pretty much -- it
5 doesn't really matter how I feel about it.  Not
6 a card of sympathy, just next day about Denine.
7 You understand what I'm saying?
8          I'm on Facebook.  She's
9 contacted -- her and my son used to talk
10 regularly, I guess, through Facebook.  All of
11 his friends are aware of the situation.
12          ~~She hasn't given me any respect~~
13 ~~and I don't care for the manner in which~~
14 ~~this whole thing went down.~~
15    Q.    Okay.  Where are you currently
16 employed?  You said you work every day.
17    A.    SimplexGrinnell.
18    Q.    And what do you do for them?
19    A.    I'm human resources, PMA
20 contractor.
21    Q.    ~~And the injuries that you have~~
22 ~~~~
23 ~~~~
24 ~~~~
25    A.    ~~~~

**41**

RENEE BLACKWELL

1
2    Q.    And is that -- also true that
3 you haven't seen a psychologist, psychiatrist,
4 social worker for these issues as well?
5    A.    ~~~~
6    Q.    With Denine coming to the vigil,
7 to your mother's house, those issues, to your
8 knowledge, has she been invited to all of those
9 places by some member of your family?
10    A.    Oh, yes.  Oh, yeah.  She -- I --
11 yes.
12    Q.    Have you done any research
13 yourself into the New Jersey laws regarding the
14 adoption registry?
15    A.    No.
16    Q.    ~~Do you have any information that~~
17 ~~any -- that DYFS acted other than in accordance~~
18 ~~with the laws of New Jersey?~~
19    A.    Do I have any information that
20 anyone from DYFS --
21    Q.    Right.  That either Ms. Helb,
22 Ms. Parnes, or any of those people that you
23 have sued -- that they acted other than in
24 compliance with the laws of the State of
25 New Jersey?

11 (Pages 38 to 41)

46

```
1              RENEE BLACKWELL
2           INSTRUCTIONS TO WITNESS
3         Please read your deposition over
4   carefully and make any necessary corrections.
5   You should state the reason in the appropriate
6   space on the errata sheet for any corrections
7   that are made.
8         After doing so, please sign the
9   errata sheet and date it.
10        You are signing same subject to
11  the changes you have noted on the errata sheet,
12  which will be attached to your deposition.
13        It is imperative that you return
14  the original errata sheet to the deposing
15  attorney within thirty (30) days of receipt of
16  the deposition transcript by you.  If you fail
17  to do so, the deposition transcript may be
18  deemed to be accurate and may be used in court.
19
20
21
22
23
24
25
```

48

```
1              RENEE BLACKWELL
2           ACKNOWLEDGMENT OF DEPONENT
3         I, _ _ _ _ _ _ _ _ _ _ _ _ _, do hereby
4   certify that I have read the foregoing pages
5   _ _ _ to _ _ _ and that the same is a correct
6   transcription of the answers given by me to the
7   questions therein propounded, except for the
8   corrections or changes in form or substance, if
9   any, noted in the attached Errata Sheet.
10  _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
11  DATE           SIGNATURE
12
13  Subscribed and sworn to before me this
14  _ _ _ _ _ day of _ _ _ _ _ _ _ _ _ _,
15  2010.
16  My commission expires: _ _ _ _ _ _ _ _ _
17
18
19  - - - - - - - - - - - -
20  Notary Public
21
22
23
24
25
```

47

```
1              RENEE BLACKWELL
2         - - - - - - - -
3         E R R A T A
4         - - - - - - - -
5   PAGE   LINE   CHANGE
6   _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
7   _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
8   _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
9   _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
10  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
11  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
12  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
13  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
14  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
15  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
16  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
17  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
18  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
19  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
20  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
21  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
22  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
23  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
24  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
25  _ _ _   _ _ _   _ _ _ _ _ _ _ _ _ _ _ _ _ _
```

13 (Pages 46 to 48)